# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Steven C. Mannion |
| v. | : Mag. No. 16-6188 |
| VINCENT P. FALCI | : CRIMINAL COMPLAINT |

I, Justyna Ramotowski, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Postal Inspector of the United States Postal Inspection Service, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Justyna Ramotowski, Postal Inspector
U.S. Postal Inspection Service

Sworn to before me, and
subscribed in my presence

December 16, 2016 at
Newark, New Jersey

HONORABLE STEVEN C. MANNION
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer

USMJ.

## ATTACHMENT A

### Counts 1 and 2
### (Wire Fraud)

From at least as early as in or about 2008 through in or about May 2016, in the District of New Jersey and elsewhere, defendant

**VINCENT P. FALCI**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate commerce the following writings, signs, signals, and sounds, each constituting a separate count of this Complaint:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | March 26, 2015 | Wire transfer of approximately $225,000 from account ending in 2317 to account ending in 2325 |
| 2 | August 13, 2015 | Wire transfer of approximately $292,250 from account ending in 2275 to account ending in 6507 |

In violation of Title 18, United States Code, Section 1343 and Section 2.

1

## Count 3
### (Securities Fraud)

From at least as early as in or about 2008 through in or about May 2016, in the District of New Jersey and elsewhere, the defendant

**VINCENT P. FALCI**

knowingly and willfully, directly and indirectly, by use of the mails and other means and instrumentalities of interstate commerce, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; ; and (c) engaging in acts, practices, and courses of business which operated as a fraud and deceit upon persons, namely, that defendant Falci falsified investment returns in funds he managed that purported to invest in tax liens to induce investors and prospective investors to purchase interests in the funds.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Justyna Ramotowski, a Postal Inspector with the U.S. Postal Inspection Service, having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only the facts which I believe are necessary to establish probable cause.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## BACKGROUND

1.  At all times relevant to this Complaint:

    a.  Vincent P. Falci ("Falci") was a resident of Middletown, New Jersey, and controlled a number of purported investment funds and management companies.

    b.  Bank-1 was a "financial institution," as defined in Title 18, United States Code, Section 20.  Bank-1 was headquartered in California, but did business worldwide.

    c.  The "Saber Funds" were a collection of investment funds Falci created and operated from beginning as early as the late 1990s or early 2000s.  The Saber Funds included a variety of entities, such as Saber Fixed Income, Saber Equity, MSI-1, Saber Opportunity Funds, and Hallus Realty Group, and were managed by Falci from an office in Middletown, New Jersey.

    d.  Vicor Tax Receivables, LLP  (the "Vicor Fund") was an investment fund Falci managed from approximately 2012 to approximately May 2016.[1]  Falci managed the Vicor Fund through his management entity, Vidon Capital Partners, LLC ("Vidon"), from an office in Middletown, New Jersey.  Falci represented to investors that the Vicor Fund invested in tax liens.[2]

---

[1] Vicor Tax Receivables, LLP was previously named Pantheon Tax Receivables, LLP, but its name was changed in or about 2015.  References to the "Vicor Fund" include all predecessor entities.

[2] Tax liens are liens levied on properties by local governments when the property taxes are unpaid.  In some states, local governments sell the right to future tax payments to third parties.

1

## **THE SCHEME TO DEFRAUD**

2. From at least in or about 2008 until in or about May 2016, Falci defrauded investors of millions of dollars through various funds he controlled by falsely representing that he would safely and soundly invest their money through various investment funds he controlled. Falci touted his investment skill and experience, and falsely reported to current and prospective investors that his funds were growing year after year. In reality, Falci operated a Ponzi scheme. Falci concealed losses from investors, falsely reporting that the funds were beating the market every year. Based on these misrepresentations, investors (new and old) continued to entrust additional investments to Falci and to leave money they had previously invested under his control. When investors wanted to make withdrawals of funds, Falci used newly invested money to make the redemptions. When his original scheme to defraud investors in the Saber Funds fell apart, Falci continued perpetrating his scheme on investors in the Vicor Fund. He eventually used the funds he had misappropriated for his own personal gain and ultimately to repay a more than $6 million restitution order entered against him by the New Jersey Bureau of Securities in connection with his fraudulent scheme to fleece investors in the Saber Funds. All told, Falci's fraudulent scheme resulted in losses of approximately at least $5.3 million.

### **The Saber Funds**

3. Falci began soliciting money in the late 1990s for investment funds he operated. He created a number of entities – both incorporated and unincorporated – and eventually came to operate them under the name Saber Funds. Many of the initial investors in the Saber Funds were associates, friends, and family members of Falci.

4. On or about September 18, 2015, Falci admitted to having violated New Jersey securities law. Specifically, on that date, a consent order was entered in the Superior Court of New Jersey, Monmouth County, resolving claims brought by the Attorney General of New Jersey on behalf of the Chief of the New Jersey Bureau of Securities against Falci and the Saber Funds for violations of New Jersey securities law (the "NJ Order"). In the NJ Order, Falci admitted that he misled investors about the Saber Funds' investments. Falci repeatedly told investors that most of the fund was investing conservatively in tax lien certificates. For instance, in a written update he sent to investors in or about 2008, he falsely claimed that more than 85% of assets were invested tax liens. But in the NJ Order, Falci admitted that tax liens never exceeded 3% of assets under management.

5. In reality, Falci diverted money to himself and to riskier investments that were often money losers.

a. In the NJ Order, Falci admitted that between 2006 and 2009, he paid himself and his family over $1 million from the Saber Funds.

b. Falci also transferred substantial sums to brokerage accounts that were used for day trading and other trades. In the NJ Order, Falci admitted that from 2006 to 2009 alone, he used approximately $554,000 to fund day-trading by himself and his son. Much of this money was lost.

c. Falci transferred approximately $3,000,000 from the Saber Funds to another entity he controlled, and used the money to buy and rehab at least seven residential properties in or about 2006 and 2007. Due to a subsequent real estate market downturn, most of these property investments also lost money.

d. Falci also admitted that he lent $185,000 of investor money to a company owned by his best friend.

6. Despite the substantial losses in the Saber Funds, Falci falsely told investors and prospective investors that the funds had positive returns year after year and that the funds were beating market indexes every year. For instance, in a letter to investors, dated December 19, 2008, Falci falsely claimed that the Saber Funds' assets were invested in 85% to 90% tax liens, that the "various funds performances once again handily beat the indices," and that the funds' model made it "virtually impossible for us not to generate positive returns year after year." In another letter to investors, dated October 21, 2011, Falci falsely claimed that the "Saber Funds' portfolio models continue to perform well," that the Saber Funds were beating "other investment choices," and that the strategy had "virtually eliminated the possibility of negative returns."

7. Falci also continued to send Saber Fund investors quarterly and annual statements showing that their investments were growing steadily over time. Federal investigators have reviewed statements provided to investors that showed the Saber Funds growing every quarter from 2008 through 2015, even while, in reality, the Saber Funds lost a substantial portion of the funds invested.

8. In reliance on these false assurances that their investments were growing, investors continued to leave their money invested with Falci, and, in some cases, to invest additional funds with Falci and his Saber Funds. When investors in the Saber Funds requested redemptions of their investments and the fund lacked the assets to repay them, Falci used money he solicited from subsequent investors to repay them.

9. The NJ Order ultimately required Falci to repay investors in the Saber Funds the balance of their investments that had not yet been redeemed: $6,742,697.57. The investigation indicates that repaying Saber Funds investors was a motivating force behind Falci's continuation of his scheme to defraud through the Vicor Fund, as set out below.

### The Vicor Fund

10. In or about 2012, Falci created the Vicor Fund and Vidon. Falci represented to investors that the Vicor Fund would invest in tax liens. Vidon was the management entity for the Vicor Fund. At that time, Falci transferred most of the assets remaining in the Saber Funds to the Vicor Fund. Falci remained the principal owner and manager of Vidon and the Vicor Fund through in or about September 2015, and retained control over Vidon and the Vicor Fund until in or about May 2016.

11. The NJ Order required that Falci divest himself of controlling interest in all funds and management entities – including the Vicor Fund and Vidon. As a result, in or about September 2015, Falci was forced to bring partners into Vidon who took a majority stake in Vidon. But even after divesting himself of his majority interest in Vidon, Falci remained the manager of Vidon and the Vicor Fund. Falci retained control over all the bank accounts associated with the Saber Funds, the Vicor Fund, and Vidon until shortly before his ouster from the Vicor Fund and Vidon in or about May 2016.

12. Law enforcement has conducted various witness interviews in connection with this case. Those interviews have revealed that, within a few months of September 2015, the new partners in Vidon noticed what appeared to be several accounting irregularities and unexplained transactions. In response to inquiries from his new partners, Falci claimed that these accounting irregularities could be cleared up once he had a chance to find the proper documentation. But Falci failed to provide any explanation. Upon further investigation, the Vidon partners discovered additional transactions in which Falci transferred funds from the Vicor Fund to his own control. As a result of what they discovered, and Falci's inability to explain the transfers, the new partners expelled Falci from Vidon in or about May 2016.

13. Federal investigators have obtained bank records for bank accounts Falci controlled in the names of various entities, including the Saber Funds and the Vicor Fund. Over the past several years, Falci appears to have controlled more than 60 different bank accounts at approximately four financial institutions (although many of these accounts are now closed). This includes approximately 27 different bank accounts at Bank-1 on which Falci was a signatory, and which were open for at least part of 2015 and 2016. These accounts at Bank-1 appear to have been the primary accounts of Falci

and the various entities he controlled from approximately January 2015 onward.

14. Based on witness interviews and a review of bank records from Bank-1 for the period from approximately January 2015 through approximately May 2016, federal investigators have identified three methods Falci used to steal money from the Vicor Fund:

a. First, Falci siphoned money out of the Vicor Fund through transfers to two bank accounts at Bank-1 that were intended to be used for the legitimate purpose of transferring money to the Vicor Fund's agent in Georgia (the "Georgia Accounts"). The Vicor Fund made legitimate investments in tax liens in Georgia, and Falci made some transfers to the Georgia Accounts that were legitimately used by the fund's agent in Georgia to buy investments in Georgia. But Falci also repeatedly transferred money to the Georgia Accounts from the Vicor Fund, and then immediately transferred those funds to another bank account he controlled (such as an account in the name of Vidon or the Saber Funds). Using this method, Falci stole over $1.7 million dollars from the Vicor Fund through the Georgia Accounts.

b. Second, Falci created a shell company – HRG Asset Recovery ("HRG") – and diverted over $700,000 to a bank account in the name of HRG. The name of the shell company was designed to make it appear as if it had a legitimate business relationship with the Vicor Fund. When asked by his partners and investors what the transfers to HRG were for, Falci lied and claimed that they were for tax lien investments in Georgia and that Vicor's agent in Georgia controlled HRG. In reality, Falci retained complete control over HRG Asset Recovery and the funds he transferred there were diverted for Falci's personal use.

c. Third, Falci transferred over $2.9 million directly from the Vicor Fund to Vidon at a time when he controlled the bank accounts for both entities. These transfers were far in excess of any management fees that Falci was entitled to collect.[3]

---

[3] Moreover, Falci's reported compensation for managing the Vicor Fund was also substantially inflated by this fraud. Falci's compensation was supposed to be based on an "operating fee" (a percentage of the funds under management), and an "incentive fee" (a percentage of the fund's return above a certain target threshold). Based on the numbers Falci reported to investors, in 2015 Falci was entitled to an operating fee of roughly $400,000 and an incentive fee of roughly $400,000. But Falci's numbers were false. In reality, the fund had a negative rate of return because of Falci's theft. Moreover, it is reasonable to expect that the funds under management would have been virtually zero had investors known the truth.

15. A substantial portion of these stolen funds were diverted to Falci personally. Between approximately January 2015 and May 2016, Falci distributed over $500,000 to himself and members of his family.

16. Falci also used the stolen funds to repay investors seeking redemptions. Investors in the Saber Funds had begun to request redemptions at an accelerated rate after the investigation by the New Jersey Bureau of Securities became public in or about September 2014. These investors had been falsely assured by Falci that their original investments were safe and had grown steadily over the years. In order to pay these investors the gains he had promised, Falci stole from the funds under his control.

17. Most of the money stolen by Falci was ultimately transferred to bank accounts in the name of Saber Funds Distributors (the "Saber Funds Accounts"). These were bank accounts at Bank-1 that were under Falci's control. An analysis of the Saber Funds Accounts showed that they appeared to be the primary bank accounts for making and receiving payments on behalf of the Saber Funds.

18. The analysis of the Saber Funds Accounts also showed that between approximately January 2015 and May 2016, Falci paid out over $4.5 million from the bank accounts. The substantial majority of these payments went to individuals that have been identified as investors in the Saber Funds. Most of this money was stolen from the Vicor Fund, although a small percentage came from additional investments made into the Saber Funds. This analysis showed that Falci did not generally keep a significant balance in the Saber Funds Accounts, but instead usually paid out the fraudulently transferred funds in a matter of days.

19. Examples of these fraudulent transfers include the following:

 a. On or about March 26, 2015, Falci transferred approximately $250,000 from Pantheon account ending in 2275 ("Pantheon 2275") to Georgia Account ending in 6867 ("Georgia Account 6867"), and then transferred $250,000 from Georgia Account 6867 to Vidon account ending in 2317 ("Vidon 2317"). On that same day, Falci transferred approximately $225,000 from Vidon 2317 to Saber Funds Account ending in 2325 ("Saber Funds 2325"). Between approximately March 26, 2015 to March 30, 2015, over $200,000 was paid out from Saber Funds 2325 to Saber Funds investors.

 b. On or about August 13, 2015, Falci transferred approximately $292,250 from Pantheon account ending in 2275 to HRG Asset Recovery account ending in 6507 ("HRG 6507"), and then transferred approximately $225,000 from HRG 6507 to Vidon 2317. On or about August 18, 2016, Falci transferred an additional approximately $45,000 from Pantheon 2275 to HRG 6507, and then transferred approximately $72,000 from HRG 6507 to Vidon

6

2317. Between on or about August 13 to 18, Falci made approximately five transfers from Vidon 2317 to Saber Funds 2325:

| | |
|---|---|
| 8/13/2015 | $60,000 |
| 8/17/2015 | $25,000 |
| 8/18/2015 | $125,000 |
| 8/18/2015 | $44,000 |
| 8/18/2015 | $31,000 |
| Total | $285,000 |

Between in or about August 18 to 24, 2015, Falci made over $250,000 in payments from Saber Funds 2325 to Saber Funds investors.

      c. On or about December 16, 2015, Falci transferred approximately $70,000 from Pantheon 2275 to HRG 6507. On the same day, Falci then transferred approximately $70,000 from HRG 6507 to Saber Funds Account ending in 2387 ("Saber Funds 2387"). The next day, a Saber Funds investor deposited a check for approximately $75,000 written from the Saber Funds 2387.